## UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF OKLAHOMA

DANA L. RANEY,                            )
                                          )
        PLAINTIFF,                )
                                          )
vs.                                       )          CASE NO. 07-CV-171-FHM
                                          )
MICHAEL J. ASTRUE,                        )
Commissioner of the                       )
Social Security Administration,           )
                                          )
        DEFENDANT.                )

## OPINION AND ORDER

Plaintiff, Dana L. Raney, seeks judicial review of a decision of the Commissioner of the Social Security Administration denying Social Security disability benefits.[1]  In accordance with 28 U.S.C. § 636(c)(1) & (3) the parties have consented to proceed before a United States Magistrate Judge.

The role of the Court in reviewing the decision of the Commissioner under 42 U.S.C. §405(g) is limited to determining whether the decision is supported by substantial evidence and whether the decision contains a sufficient basis to determine that the Commissioner has applied the correct legal standards. *Grogan v. Barnhart*, 399 F.3d 1257, 1261 (10th Cir. 2005).  Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Doyal v. Barnhart*, 331 F.3d 758 (10th Cir.

---

[1]  Plaintiff's March 11, 2004 applications for Disability Insurance and Supplemental Security Income benefits were denied initially and upon reconsideration.  A hearing before an Administrative Law Judge (ALJ) was held July 26, 2006.  By decision dated September 27, 2006, the ALJ entered the findings which are the subject of this appeal.  The Appeals Council denied review of the findings of the ALJ on January 24, 2007.  The action of the Appeals Council represents the Commissioner's final decision for purposes of further appeal. 20 C.F.R. §§ 404.981, 416.1481.

2003).  The Court may neither reweigh the evidence nor substitute its judgment for that of the Commissioner. *See Hackett v. Barnhart*, 395 F.3d 1168, 1172 (10th Cir. 2005). Even if the Court might have reached a different conclusion, if supported by substantial evidence, the Commissioner's decision stands. *White v. Barnhart*, 287 F.3d 903, 908 (10th Cir. 2002).

Plaintiff was 43 years old at the time of the hearing. [R. 375].  She claims to have been unable to work since July 4, 2002, due to: major depression, severe with psychotic features; post traumatic stress syndrome; anxiety with agoraphobia;[2] borderline personality disorder; back pain and stiffness; and confusion, fatigue and muscle cramps caused by medication side effects. [R. 95, 111, 380, 381, Plaintiff's Opening Brief, Dkt. 16].  The ALJ determined that Plaintiff has severe impairments consisting of lumbosacral strain, bipolar disorder, anxiety disorder and cannabis abuse. [R. 20].  Despite these impairments, the ALJ found that Plaintiff retains the residual functional capacity (RFC) to: lift and/or carry 20 pounds frequently and 50 pounds occasionally; stand for 6 hours in an 8-hour workday at 2 hour intervals; walk for 6 hours in an 8-hour day at 2 hour intervals; sit up to 8 hours in an 8-hour day at 4 hour intervals; and occasionally bend, squat, crawl, climb and reach; with marked limitation in the ability to understand, remember and carry out detailed instructions and interact appropriately with the public. [R.21].  Based upon the testimony of a vocational expert (VE), he determined that Plaintiff's RFC did not preclude returning to her past relevant

---

[2] Agoraphobia is intense, irrational fear of open spaces, characterized by marked fear of being alone or of being in public places where escape would be difficult or help might be unavailable. Called also panic disorder with agoraphobia [DSM-III-R]. Dorlands Ills. Medical Dictionary, 28th ed.(1994) 38.

2

work (PRW) as an injection mold operator. [R. 24].  As an alternative finding, the ALJ concluded there are jobs that exist in significant numbers in the national economy that Plaintiff can perform with this RFC and that, therefore, Plaintiff is not disabled as defined by the Social Security Act. [R. 24-25].  The case was thus decided at step four with an alternative finding at step five of the five-step evaluative sequence for determining whether a claimant is disabled. *See Fischer-Ross v. Barnhart*, 431 F.3d 729, 731 (10th Cir. 2005) (describing the five steps); *Williams v. Bowen*, 844 F.2d 748, 750-52 (10th Cir. 1988) (discussing five steps in detail).

Plaintiff asserts the ALJ erred: 1) because he failed to consider the diagnosis of Axis II impairments that directly impact Plaintiff's ability to function; 2) because he failed to properly evaluate Plaintiff's impairments pursuant to "paragraph B" of the mental listings; 3) because he failed to consider the impact of impairments he "ignored at step 2" on Plaintiff's ability to work; 4) by failing to perform a proper evaluation of the medical evidence; 5) by failing to perform a proper credibility determination in evaluating Plaintiff's activities of daily living (ADLs); 6) in failing to properly evaluate Plaintiff's anxiety; 7) in failing to properly evaluate Plaintiff's testimony; 8) in failing to perform a proper credibility determination because he failed to properly examine the evidence from Plaintiff's treating and examining sources; 9) in failing to perform a proper credibility determination because he omitted several important considerations; 10) in failing to perform a proper evaluation at step four); and 11) in failing to perform a proper evaluation at step five. [Plaintiff's Opening Brief, Dkt. 16, p. 1-2].  For the following reasons, the Court finds this case must be reversed and remanded to the Commissioner for reconsideration.

**Medical Evidence**

Plaintiff reported a long-standing history of depression caused by childhood emotional and sexual abuse when she sought treatment at Associated Centers for Therapy (ACT) on June 20, 2003. [R. 137-148].  During her four month treatment period at ACT, she was diagnosed with and treated for major depression causing daily tearfulness, rage, thoughts of suicide, sleep disruption, loss of appetite, difficulty with memory, auditory hallucinations and marijuana abuse. [R. 138-148].  When Plaintiff's mental health care was transferred from ACT to Edwin Fair Mental Health Center (Edwin Fair) on October 29, 2003, Plaintiff's symptoms were "under good control." [R. 137-138].

Plaintiff's first psychological assessment at Edwin Fair was November 11, 2003. [R. 210-214].  On December 8, 2003, she was sent from there to Via Christi Oklahoma Regional Medical Center in Ponca City, Oklahoma, for crisis intervention where she was admitted for inpatient treatment. [R. 214-215, 160].  Upon admission, Plaintiff's speech was pressured, she was experiencing auditory and visual hallucinations and she was emotionally labile after having been told on Thanksgiving Day that her father had sexually abused her youngest sister. [R. 160-162].  Her GAF score was 40. [R. 162].[3]  She was hospitalized December 9, 2003 through December 12, 2003. [R. 157-

---

[3]  The global assessment of functioning (GAF) score "is a subjective determination based on a scale of 100 to 1 of the clinician's judgment of the individual's overall level of functioning. American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders (Text Revision 4th ed. 2000) [DSM-IV-TR] at 32. A GAF of 31-40 indicates: "Some impairment in reality testing or communication (e.g. speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school)." *Id.* at 34.

168].   At discharge, Plaintiff was in good emotional control and denied suicidal or homicidal thoughts; but her husband was consulted to ensure there were no guns in the home. [R. 158].   The final diagnosis was: "Axis I: Major depression, moderate, recurrent, with psychotic features; Posttraumatic stress disorder; Cannabis dependence; Axis II: None; Axis III: Partial hysterectomy, Irritable bowel syndrome, History of hypoglycemia; and Axis IV: "Her father has had some problems recently; Low finances; Does not have a job." [R. 159].  She was given Lexapro, an antidepressant, and told to followup at the Edwin Fair. [R. 158, 191].  Her GAF score at discharge was 50. [R. 159].[4]

Plaintiff continued treatment at Edwin Fair and on December 15, 2003, she was diagnosed with: "Axis I: Major Depression, Recurrent, Severe, With Psychotic Features; Posttraumatic Stress Disorder; Cannabis Abuse; Axis II: No Diagnosis. R/O Borderline Personality Disorder; Axis III: No known medical conditions; Axis IV: Occupational, Economic; and Axis V: GAF of 45 (highest level past year 50)." [R. 202-209].  Plaintiff reported she was less depressed on December 18, 2003, but she was still hearing voices. [R. 189-190].

Alzira Vaidya, M.D., Plaintiff's psychiatrist, determined Plaintiff's diagnosis needed to be changed to Bipolar II Disorder and he adjusted Plaintiff's medications accordingly. *Id.*   On January 22, 2004, the psychiatrist reported Plaintiff was "very happy with the way she is doing on the medications" and that her only side effects were

---

[4] A GAF score of 41-50 indicates serious symptoms (e.g. suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job). DSM-IV-TR, at 34.

muscle cramps at night caused by Seroquel, an antipsychotic medication. [R. 188]. Plaintiff's affect was bright and she denied being suicidal or hearing voices. *Id.* On January 29, 2004, Plaintiff was assigned to individual therapy with a practicum student under supervision. [R. 217].   Dr. Vaidya wrote on February 19, 2004, that Plaintiff's moods and depression were "in control," that she denied suicidal thoughts or hearing voices but complained of more leg cramps since being on Seroquel. [R. 187].   The doctor reported that Plaintiff had slowed down on her cannabis abuse but that he advised her to quit using it completely. *Id.*  Other than a slightly increased GAF score to 49, Plaintiff's status remained unchanged on April 1, 2004. [R. 192-196]. On May 13, 2004, Dr. Vaidya reported Plaintiff had a bright affect, she was not having mood swings and liked how the medication was working for her. [R. 186].   Plaintiff acknowledged smoking marijuana an average of twice a week and was told she would need to go to substance abuse rehab if she could not quit on her own. *Id.*  A note in Dr. Vaidya's file on June 8, 2004, indicates Plaintiff's prescription for Seroquel was refilled. [R. 185].

A psychiatric review technique (PRT) form signed by Burnard L. Pearce, Ph.D., dated May 14, 2004, appears in the record. [R. 169-183].   The Listings applied were: 12.04, Affective Disorders; 12.06, Anxiety-Related Disorders; and 12.09 Substance Addiction Disorders. [R. 169].  Plaintiff was determined to have met the "A" Criteria for medically determinable impairments under Listing 12.04, Bipolar II [R. 172] and under Listing12.06, Posttraumatic Stress Disorder, Chronic [R. 174].  Under Listing 12.09, the presence of behavioral changes or physical changes associated with the regular use of substances that affect the central nervous system was to be evaluated under the two

6

previous listings. [R.177].   Dr. Pearce rated moderate functional limitations under: Restriction of Activities of Daily Living; Difficulties in Maintaining Social Functioning; and Difficulties in Maintaining Concentration, Persistence, or Pace.   He assessed one or two: Repeated Episodes of Decompensation, Each of Extended Duration.[R. 179].   Dr. Pearce noted Plaintiff's treatment records from Edwin Fair and her reported activities of daily living. [R. 181].   He determined Plaintiff has the functional capacity to perform simple tasks on a routine basis, to interact appropriately with co-workers and supervisors on a superficial level for work related functions and that she can adapt to change in the work place but she should avoid contact with the general public. [R. 183].

The record contains a report and a Mental Medical Source Statement by John W. Hickman, Ph.D., a clinical psychologist, who examined and evaluated Plaintiff on July 19, 2005. [R. 236-240].   Dr. Hickman summarized Plaintiff's family, social, educational and vocational history and noted review of Plaintiff's medical records. [R. 237].   He administered the Mental Status Exam, the Wechsler Adult Intelligence Scale-III, the Wechsler Memory Scale-III,  the Beck Depression Inventory-II, the Beck Anxiety Inventory and the Roschach Psychodiagnostic technique. [R. 237-238].   Dr. Hickman diagnosed: Axis I: Depressive disorder, chronic, Anxiety disorder, chronic, Marijuana dependence, chronic, Nicotine dependence; Axis II: Features of a borderline personality disorder; Axis III: History of hypoglycemia and irritable bowel syndrome; Axis IV: Mild

psychosocial stress; Axis V: GAF - 60, moderate emotional difficulties.[5] [R. 240].  His

prognosis was:

> I would not expect much change in Ms. Raney's functioning
> in the near future.  I think her borderline personality disorder
> features make it stressful for her to try to cope with her
> emotional reactivity to others.  She had difficulty sustaining
> employment for more than a few years before she
> repeatedly switched jobs to reduce her stress.  She currently
> stays home and away from social contacts.  Her chronic
> heavy use of marijuana contributes to her difficulty with
> moods and impulse control and increases her anxiety as
> does her hypoglycemia.  I think there are functional and
> secondary gain values to her current adjustment that are
> unlikely to change.

[R. 241].  On the mental statement checklist form, Dr. Hickman indicated no limitation

for most basic work functions and no significant limitations for the remaining basic work

functions. [R. 242-245].

On January 11, 2006, Plaintiff was examined and evaluated by E. Joseph Sutton,

II, D.O. [R. 259-272].  He reported Plaintiff's symptoms are completely subjective and

that her physical examination was completely normal. [R. 262].   Other than mild

calcifications in the soft tissue of the left mid neck, x-rays of Plaintiff's cervical and

lumbar spine were normal. [R. 258].

Dennis A. Rawlings, Ph.D., performed a psychological evaluation on January 23,

2006. [R. 273-280].   On the Mental Medical Source Statement checklist form dated

January 24, 2006, Dr. Rawlings indicated "moderate limitations" in Plaintiff's ability: to

perform activities within a schedule, maintain regular attendance and be punctual within

---

[5]  A GAF rating of 51-60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." DSM-IV-TR, at 34.

customary tolerances; to sustain an ordinary routine without special supervision; to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; to accept instructions and respond appropriately to criticism from supervisors; to get along with co-workers or peers without distracting them or exhibiting behavioral extremes; to respond appropriately to changes in the work setting; and to set realistic goals or make plans independently of others. [R. 277-279].   He indicated "marked limitations" in Plaintiff's ability to ask simple questions or request assistance. [R. 278].   All other basic work functions had no limitations. [R. 277-279].

Dr. Rawling's typed report to the agency is dated February 10, 2006.   He noted review of Dr. Hickman's test results, Plaintiff's treatment records from Edwin Fair, Dr. Vaidya's records, and the ACT records. [R. 273-274]. After conducting his own tests, Dr. Rawlings reported that Plaintiff's MMPI-2 profile was technically invalid due to her gross over reporting of psychotic symptomology but the test results were felt to be a reliable and valid assessment of Plaintiff's current level of memory functioning. [R. 275]. He diagnosed:

> Axis I: Major Depressive Disorder, Recurrent, Severe, With Psychotic Features Versus Bipolar I Disorder, Most Recent Episode Mixed With Psychotic Features, Anxiety Disorder NOS, By Patient Report; Posttraumatic Stress Disorder, Secondary to Chronic Emotional Abuse and Lesser Sexual Abuse, Child and Adolescent Mental and Sexual Abuse Victim, Cannabis Dependence, Status Unknown;
>
> Axis II: Borderline Personality Disorder;
>
> Axis III: See physician's report;

9

> Axis IV: Problems with the Primary Support Group - Sexual
> Abuse, Parental Neglect of a Child, Inadequate Discipline,
> Problems Related to the Social Environment, Occupational
> Problems;
>
> Axis IV: GAF Current Year: 55, GAF Past Year: 55.

[R. 275-276].  He wrote: "May not be able to maintain competitive work primarily due to Mood Disorder and Personality Disorder." [R. 276].

The record contains a Mental Status Form, a questionnaire that has handwritten responses by Alan Hasegawa, M.D., dated March 7, 2006. [R. 282-283].  With respect to Plaintiff's prognosis, Dr. Hasegawa wrote: "She can carry out and comprehend simple task but would have difficulty with complex task outside her routine.  I do not believe she is capable of dealing with work pressures." (sic) [R. 283].

On the Mental RFC Assessment checklist form, Dr. Hasegawa indicated "marked limitations" in ability: to understand and remember detailed instructions; to carry out detailed instructions; to maintain attention and concentration for extended periods; to sustain an ordinary routine without special supervision; to get along with coworkers or peers without distracting them or exhibiting behavior extremes; to respond appropriately to changes in the work setting; and to set realistic goals or make plans independently of others. [R. 284-285].  He checked "severe limitation" for ability to: perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances; work in coordination with or proximity to others without being distracted by them; complete a normal work-day and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; interact appropriately with the general

10

public; accept instructions and respond appropriately to criticism from supervisors; travel in unfamiliar places or use public transportation. [R. 284-285].  In all other work activities, Dr. Hasegawa assigned moderate limitations. *Id.*

Also in the record are two typewritten pages identified as treatment records from Laureate Psychiatric Clinic and Hospital dated March 7, 2006 and April 5, 2006. [R. 340-342].  They appear to be initialed by Dr. Hasegawa. [R. 341-342].  The page dated March 7, 2006, mirrors Dr. Hasegawa's mental status examination findings expressed in his handwritten notes, as follows:

> She is oriented times three.  She is able to recall 6/6 objects immediately and after a few minutes.  She is able to spell WORLD backwards.  She knows our current president back to Clinton.  She was given a Newsweek article and she is able to read the words but has difficult comprehending what the point of the article was.  Prior to reading the article, she was euthymic but she started crying when she was not able to tell what the article was about saying she used to be a good reader and it upsets her as to the problems she is now having.  Denies any problems with drugs or alcohol.

[R. 342].  Dr. Hasegawa also said:

> No suicidal ideations or impulses since last seen.
>             *    *    *
> She has been doing well overall on the current regimen.

*Id.*

In the April 5, 2006 progress notes, Dr. Hasegawa reported Plaintiff's mood was positive and her anxiety under control. [R. 341].  He said: "She still does not drive and confines herself at home.  For her, this is not a problem.  She is still fearful of stranger and does not go out on her home.  She still has short attention span." (sic)  He assessed Plaintiff's status as stable, with a bright affect but noted she still had

agoraphobia which she was not motivated to change.  Sexual side effects caused by

medication was discussed and Plaintiff was told to return in three months or sooner  if

needed. *Id.*  A handwritten note on the same page indicates Plaintiff cancelled her July

5, 2006 appointment. [R. 341].

The record also contains surgical records from St. John Medical Center dated

May 5, 2006, for severe pelvic adhesions. [R. 287-311].

### Discussion

The ALJ's decision was issued September 27, 2006. [R. 18-26].   Shortly

afterward, on October 5, 2006, the Tenth Circuit published *Salazar v. Barnhart*, 468 F.3d

615 (10th Cir. 2006).   The *Salazar* Court held that the ALJ's failure to consider the

claimant's borderline personality disorder was error.  The court found this failure to be

particularly troublesome because the condition "may account for [claimant's] abuse of

drugs and alcohol, as well as her suicidal conduct and self-mutilation." *Id.* at 622.  The

court said:

> Borderline personality disorder is marked by at least five of
> the following symptoms:(1) [I]mpulsiveness in, inter alia,
> substance abuse; (2) instability of mood, interpersonal
> relationships and self-image; (3) sieges of depression,
> irritability and anxiety; (4) lack of anger control and recurrent
> physical fights; (5) threats of suicide and attempts at self-
> mutilation; (6) uncertainty about career or long-term goals;
> and (7) persistent feeling of boredom or emptiness.

*Id.* (citing *McGoffin v. Barnhart*, 288 F.3d 1248, 1250 n.2 (10th Cir. 2002); 2 J.E.

Schmidt, Attorneys' Dictionary of Medicine (LexisNexis) (additional internal citations

omitted)).  The *Salazar* Court recognized that borderline personality disorder often co-

occurs  with  mood  disorders  and,  when  criteria  for  both  are  met,  both  may  be

diagnosed.  The court found, therefore, that the ALJ's failure to consider the claimant's borderline personality disorder, singly and in combination with her other impairments, required reversal. *Id.*

In the instant case, borderline personality disorder was suspected after Plaintiff was hospitalized in December 2003 and returned to Edwin Fair for continuing psychiatric treatment. [R. 202-209].  Dr. Vaidya changed Plaintiff's Major Depression diagnosis to Bipolar II Disorder later that month. [R. 190].  According to the Edwin Fair records, borderline personality disorder still had not been ruled out in April 2004. [R. 189-190, 192].  None of Dr. Vaidya's records after that date list any diagnoses. [R. 185-188].

Dr. Hickman diagnosed "[f]eatures of a borderline personality disorder" at Axis II when he examined Plaintiff in July 2005. [R. 240-241].  Dr. Hickman emphasized Plaintiff's difficulty in sustaining employment caused by these "features." *Id.*  The ALJ cited Dr. Hickman's mental activity ratings without commenting on this portion of Dr. Hickman's opinion. [R. 21-22].

The ALJ summarized Dr. Rawlings' limitation ratings and reported that "Dr. Rawlings said the claimant appeared to have a borderline personality disorder implicating on mental illness." [R. 22].  This quote was taken from the handwritten "elaborations" accompanying Dr. Rawlings' Mental Medical Source Statement signed on January 24, 2006. [R. 277-281].  Dr. Rawlings' typed report, dated two weeks later and referencing Dr. Hickman's test results and Plaintiff's prior treatment records, contains a definitive diagnosis of borderline personality disorder. [R. 276].  The ALJ did not mention this diagnosis, nor did he address Dr. Rawlings' statement that Plaintiff

13

"may not be able to maintain competitive work primarily due to mood disorder and personality disorder." [R. 21-22, 276].  Instead, the ALJ decided to "not give great weight" to Dr. Rawlings' opinion because "it appears to be based on a recitation of the claimant's complaints" and because it was a one-time evaluation. [R. 23].

The Court notes that Plaintiff's attorney advised the ALJ at the commencement of the hearing that Dr. Hickman had found "that the personality disorder was a problem" and "some real significant limitations" had been found by Dr. Rawlings.  [R. 375]. Despite this notice that Plaintiff was alleging borderline personality disorder as one of her severe mental impairments, the ALJ inexplicably failed to consider this claim. *See* Social Security Ruling (SSR) 96-8p ("The adjudicator must consider all allegations of physical and mental limitations or restrictions and make every reasonable effort to ensure that the file contains sufficient evidence to assess RFC.").  Because the ALJ did not include a finding at step two regarding Plaintiff's claim of borderline personality disorder, it appears he decided it was not a medically determinable impairment.

Although the Court does not reweigh evidence or try the issues de novo, *Grogan*, 399 F.3d at 1262 (citing *Sisco v. U.S. Dept. of Health & Human Servs.*, 10 F.3d 739, 741 (10th Cir. 1993), the Court must meticulously examine the record as a whole, including anything that may undercut or detract from the ALJ's findings in order to determine if the substantiality test has been met. *Grogan*, *id.* (citing *Washington v. Shalala*, 37 F.3d 1437, 1439 (10th Cir. 1994).  Additionally, while the ALJ is free to choose between two conflicting reports by consultative examiners, *See Eggleston v. Bowen*, 851 F.2d 1244, 1247 (10th Cir. 1988) (ALJ's task to resolve conflicts in the medical evidence) he must explain the weight he accorded the opinions and his reasons for that weight. 20 C.F.R. §

14

416.927(f)(2)(ii); *Gotcher v. U.S. Dept of Health & Human Servs.*, 52 F.3d 288, 290(10th Cir. 1995) (detailing how medical source opinion evidence is weighed).

In this case, the Court concludes that the findings of the two consultative examining physicians, Dr. Hickman and Dr. Rawlings, with regard to Plaintiff's personality disorder are sufficient to meet the *de minimus* showing required at step two. *Hawkins v. Chater*, 113 F.3d 1162, 1169 (10th Cir. 1997)  (claimant's threshold showing that his medically determinable impairment or combination of impairments significantly limits his ability to do basic work activities is *de minimus*) (citing *Williams*, 844 F.2d at 751). There is no indication in the ALJ's written decision how he determined Plaintiff's severe impairments at step two did not include borderline personality disorder despite the findings of both these physicians.  In light of the *Salazar* ruling, the Court finds this case must be reversed and remanded to the Commissioner to reconsider his step two findings with regard to Plaintiff's claim of a severe mental impairment of Borderline Personality Disorder, singly and in combination with her other impairments. *Langley v. Barnhart*, 373 F.3d 1116, 1123 (10th Cir. 2004) (impairments must be considered singly and in combination in determining whether claimant is disabled).

With regard to the ALJ's evaluation of the medical evidence, the Court also finds grounds for reversal.  First, the ALJ did not give an adequate explanation of the weight he accorded probative medical evidence.  He gave diminished weight to some of the medical evidence without explaining how much weight it was accorded or how that evidence impacted his RFC determination.  Second, he simply ignored other probative medical evidence without explanation.  "There are specific rules of law that must be followed in weighing particular types of evidence in disability cases. Failure to follow these

15

rules constitutes reversible error." *Reyes v. Bowen*, 845 F.2d 242, 244 (10th Cir.1988) (citation omitted).  The ALJ is required to "evaluate every medical opinion" he receives, 20 C.F.R. §§ 404.1527(d), 416.927(d), and to "consider all relevant medical evidence of record in reaching a conclusion as to disability."  *Baker v. Bowen*, 886 F.2d 289, 291 (10th Cir.1989).  The ALJ did not do so in this case.

It is not clear whether the ALJ rejected Dr. Rawlings' findings in favor of Dr. Hickman's[6] because he did not identify what medical evidence he relied upon in determining Plaintiff's mental limitations.[7]  In his decision, the ALJ addressed only Dr. Rawlings' and Dr. Hasegawa's opinions, saying he did not give "great weight" to Dr. Rawlings and only "little weight" to Dr. Hasegawa. [R. 23].  As to the diminished value the ALJ accorded Dr. Rawlings' report, the Court notes the reasons given are not supported by the record. [R. 23].  Both consultative physicians performed concentration, memory and cognitive tests and Dr. Rawlings reviewed Dr. Hickman's testing results as well as conducting his own.  He also reviewed Plaintiff's treatment records.  Thus, the ALJ's statement that Dr. Rawlings' findings appear to be based on a recitation of Plaintiff's complaints is incorrect.  The other reason given by the ALJ for not giving great weight to Dr. Rawlings' opinion, that it was based upon a one time evaluation, is not

---

[6] The ALJ referred to Dr. Sutton's physical RFC form in his hypothetical to the vocational expert at the hearing. [R. 402, 270-272].  The ALJ did not give the basis for the marked limitations in ability to understand and remember detailed instructions and to interact appropriately with others which he included in the RFC either at the hearing or in his written decision. [R. 402-403].  Dr. Hickman checked "no limitation" and "no significant limitation" in his RFC statement and Dr. Rawlings checked a number of "moderate limitations" under the sustained concentration and persistence, social interaction and adaptation categories and only one "marked limitation," that being: "ability to interact appropriately with the general public." [R. 242-245, 277-280].

[7] Dr. Pearce's 2004 PRT ratings are "moderate" rather than "marked" but his mental functional capacity findings are the same as the mental limitations included in the RFC assessed by the ALJ. However, the ALJ did not identify Dr. Pearce's opinion as the source for his RFC. [R. 183].

persuasive in this case.  Both doctors were consultative agency physicians who examined Plaintiff one time.  And, while it is clear that the ALJ disregarded Dr. Rawlings' findings, the ALJ's written decision does not indicate whether he gave any weight at all to Dr. Hickman's findings since he did not adopt Dr. Hickman's activity ratings in assessing Plaintiff's RFC.  Upon remand, the Commissioner must support his RFC findings with substantial evidence. *See* SSR 96-8p, *id.*

In addition, the ALJ decided to not accord treating physician deference to the opinion of Dr. Hasegawa because "it would seem that March 7, 2006, was the first time he had seen the claimant."  Review of Dr. Hasegawa's treatment notes, however, indicates the opposite. [R. 342 ("No suicidal ideations or impulses since last seen"... "has been doing well overall on the current regimen")].  Upon remand, the Commissioner should recontact Dr. Hasegawa to resolve this question. *See* 20 C.F.R. §§ 404.1512(e)(1) and 416.912(e)(1) ("We will seek additional evidence or clarification from your medical source when the report from your medical source contains a conflict or ambiguity that must be resolved, the report does not contain all the necessary information, or does not appear to be based on medically acceptable clinical and laboratory diagnostic techniques."); *see also   McGoffin,* 288 F.3d at 1252 (holding ALJ had obligation to recontact treating physician if validity of his report open to question).

After reconsideration of the medical evidence at step two and, if necessary, further development of the record at this step, the ALJ will need to revisit his findings at subsequent steps in the evaluative sequence.  Therefore, Plaintiff's remaining allegations of error are not addressed in this Order.

Because the ALJ did not properly consider Plaintiff's borderline personality disorder and failed to properly evaluate the medical evidence, the Court concludes the ALJ's decision is not supported by substantial evidence. *See, e.g., O'Dell v. Shalala*, 44 F.3d 855, 858 (10th Cir.1994) ("Evidence is insubstantial if it is overwhelmingly contradicted by other evidence").  Accordingly, the decision of the Commissioner finding Plaintiff not disabled is REVERSED and REMANDED to the Commissioner for reconsideration.

Dated this 7th day of May, 2008.


FRANK H. McCARTHY
UNITED STATES MAGISTRATE JUDGE